FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

PJM/CAH USAO#2018R00484
LJW 10/13/2020

2020 OCT 14  PM 5: 12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BY_____ DEPUTY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **UNDER SEAL** |
| | : | |
| **v.** | : | |
| | : | **Criminal No.** |
| **DARREN PARKER,** | : | |
| **ANDRE DAVIS, a/k/a "2 Chainz,"** | : | **(Racketeering Conspiracy, 18 U.S.C.** |
| **TALAIA YOUNGBLOOD,** | : | **§ 1962(d); Forfeiture, 21 U.S.C. § 853)** |
| **JAMES HAIR, a/k/a "Mook,"** | : | |
| **DONTE THOMAS, a/k/a "Cruddy"** | : | |
| **BERNARD BEY, a/k/a "Tony Bey,"** | : | |
| **ANDRE WEBB, a/k/a "Arnie,"** | : | |
| **LYNETTE CARLEST, and** | : | |
| **JASMINE COLEMAN,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## INDICTMENT

### COUNT ONE
### (Racketeering Conspiracy)

The Grand Jury for the District of Maryland charges that at all times relevant to this

Indictment:

### The Enterprise

1.     The Chesapeake Detention Facility (CDF) was a Maryland Department of Public

Safety and Correctional Services (DPSCS) facility operated pursuant to a contract with the United

States Marshals Service (USMS) and used solely for the housing of federal pretrial detainees.  CDF

was located in Baltimore, Maryland.

2.      CDF was a maximum security facility that housed approximately 500 male and female detainees.  The facility consisted of six housing areas, or "pods."

3.      Although detainees at CDF were assigned to specific pods, they were able to interact with detainees from other pods in the recreational yard, in on-site medical offices, in the library, and in other settings.  Certain detainees were assigned jobs—such as sanitation jobs or jobs delivering laundry or meals—that allowed them to move between pods or to be out of their cells when other detainees were confined to their cells.  Such detainees were commonly referred to as "working men."

4.      CDF employed 198 correctional officers (COs) and other employees in 2020.

5.      Maryland law defines "contraband" as "any item, material, substance, or other thing that: (1) is not authorized for inmate possession by the managing official; or (2) is brought into the correctional facility in a manner prohibited by the managing official."  Md. Code Ann., Crim. Law § 9-410.[1]  Under Maryland law, a person may not "(1) deliver any contraband to a person detained or confined in a place of confinement; (2) possess any contraband with intent to deliver it to a person detained or confined in a place of confinement; or (3) knowingly possess contraband in a place of confinement."  Md. Code Ann., Crim. Law § 9-412.

6.      Under federal law, a person may not provide or attempt to provide a prohibited object to an inmate of a prison.  18 U.S.C. § 1791(a)(1).  Similarly, inmates are prohibited from making, possessing, obtaining, or attempting to make or obtain prohibited objects.  18 U.S.C. § 1791(a)(2).     Federal law defines as "prohibited objects" controlled substances; alcoholic beverages; United States currency; phones or other devices used by a user of commercial mobile

---

[1]      "Managing official" is defined as "the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a place of confinement."  *Id.*

service; objects designed or intended to be used as weapons; and "any other object that threatens the order, discipline, or security of a prison, or the life, health, or safety of an individual." 18 U.S.C. § 1791(d). "Prison" is defined to include any facility, such as CDF, "in which persons are held in custody by direction of or pursuant to a contract or agreement with the Attorney General."

7.     CDF correctional officers received annual training in ethics and professionalism. COs were taught that:

> Inappropriate relationships with inmates can include bribery, conflicts of interest, solicitation and acceptance of gifts, the offering of gifts, favors and services to inmates, ex-inmates, relatives of inmates, improper contact or failure to report contact with inmates, ex-inmates, relatives or friends and the appearance of inappropriate relationships.

According to the Correctional Officers Handbook:

> The illegal possession and/or use of any controlled substance and/or controlled paraphernalia while on or off duty is strictly prohibited…. An employee may not possess or convey contraband into an institution or onto institutional property.

8.     CDF constituted an "enterprise," as defined in 18 U.S.C. § 1961(4). CDF engaged in, and its activities affected, interstate commerce.

**Purpose of the Enterprise**

9.     The primary purpose of CDF was the safe confinement and supervision of federal pretrial detainees in the District of Maryland. Correctional officers had a duty to further the legitimate purpose of CDF by ensuring that detainees followed the rules enacted for their health and safety and the health and safety of CDF employees and the larger community, including the prohibition of criminal activity while detained.

3

### Purposes of the Defendants

10.     The purposes of the defendants were to violate the legitimate purposes of CDF to further their illegal scheme and create a culture of corruption and lawlessness inside the facility that would allow them to continue their racketeering activity.

Correctional Officer Defendants

11.     The correctional officer defendants abused their positions of trust as sworn officers of DPSCS by engaging in illegal activities for the purpose of enriching themselves and, in some cases, engaging in sexual relations with detainees. The correctional officer defendants solicited and received bribes in exchange for bringing contraband into CDF, including narcotics, cell phones, and tobacco. The following defendants were COs assigned to CDF for some or all of the time period charged in this Indictment:

> a. **DARREN PARKER**,
> b. **ANDRE DAVIS, a/k/a "2 Chainz," and**
> c. **TALAIA YOUNGBLOOD**

Detainee Defendants

12.     The detainee defendants corrupted correctional officers and employees by offering them money and other things of value in exchange for smuggling contraband into CDF and transporting it within CDF.   The detainee defendants enriched themselves by trafficking contraband, including narcotics, alcohol, tobacco and cell phones to other detainees.   The detainee defendants used facilitators outside CDF to bribe the correctional officer defendants, to deliver contraband to them, and to collect and manage the illegal proceeds of their contraband trafficking activities inside the jail.  The detainee defendants used contraband cell phones to coordinate their smuggling and contraband trafficking activity.  The following defendants were detainees housed at CDF during some or all of the time period charged in this Indictment:

4

    a. **JAMES HAIR, a/k/a "Mook,"**
    b. **DONTE THOMAS, a/k/a "Cruddy,"**
    c. **BERNARD BEY, a/k/a "Tony Bey," and**
    d. **ANDRE WEBB, a/k/a "Arnie"**

Facilitator Defendants

13.    The outside facilitator defendants participated in unlawful activities in furtherance of the COs' and detainees' purposes by procuring narcotics, cell phones, and tobacco; by transporting narcotics, cell phones, and tobacco to COs; and by paying bribes to COs in exchange for the COs' assistance in smuggling narcotics, cell phones, and tobacco to detainees. The facilitator defendants also collected payments from the detainee defendants' customers and managed the proceeds of the detainee defendants' contraband trafficking activities. The following defendants acted as outside facilitators during some or all of the time period charged in this Indictment:

    a. **LYNETTE CARLEST, and**
    b. **JASMINE COLEMAN,**

## **The Racketeering Violation**

14.    Beginning at a date unknown to the Grand Jury, but at least by in or about 2016, through on or about the date of this Indictment, in the District of Maryland and elsewhere, the defendants,

**DARREN PARKER,**
**ANDRE DAVIS, a/k/a "2 Chainz,"**
**TALAIA YOUNGBLOD,**
**JAMES HAIR, a/k/a "Mook,"**
**DONTE THOMAS, a/k/a "Cruddy,"**
**BERNARD BEY, a/k/a "Tony Bey,"**
**ANDRE WEBB, a/k/a "Arnie,"**
**LYNETTE CARLEST, and**
**JASMINE COLEMAN,**

being persons employed by and associated with CDF, an enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, together with each other and with persons known and unknown to the Grand Jury, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree to violate Section 1962(c) of Title 18, United States Code, that is, to conduct and participate, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, as defined in Sections 1961(1) and (5) of Title 18, United State Code, which pattern of racketeering activity consisted of multiple:

a. Acts involving bribery, chargeable under Md. Code. Ann., Crim. Law. § 9-201 (Maryland bribery of public employee);

b. Acts indictable under 18 U.S.C. § 1956 (related to the laundering of monetary instruments); and

c. Offenses involving trafficking in controlled substances, in violation of 21 U.S.C. §§ 841 (distribution and possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with intent to distribute controlled substances).

## Means and Methods of the Racketeering Conspiracy

15.    Among the means and methods by which the defendants and others pursued their illegal purposes were the following:

16.    The defendants conspired to smuggle contraband, including narcotics, cell phones, and tobacco into CDF. The defendants conspired to possess such contraband both inside and outside CDF with the intent to distribute and sell it for the purpose of enriching themselves and expanding their criminal operation.

17.    The defendants conspired to distribute narcotics inside CDF, including buprenorphine, commonly referred to by the trade name "Suboxone," a prescription opioid used

6

to treat heroin addiction but abused by detainees; marijuana; and synthetic marijuana, commonly referred to as "K2."

18.     The defendant COs accepted and agreed to accept payments from facilitators and detainees as consideration for smuggling contraband into CDF.  Some COs also engaged in sexual relations with detainees in exchange for smuggling contraband into CDF.

19.     The defendant detainees acted as both wholesalers and retailers of contraband, thereby generating profits that far exceeded those they could make selling similar products on the street.  For example, the defendant detainees and facilitators could purchase 12 milligram Suboxone strips on the street for approximately $8 each, and then sell them in CDF for approximately $75 each—a profit of more than 800 percent.

20.     The defendant COs smuggled contraband into CDF.  Although required to pass though screening, COs were able to hide contraband on their persons, in their clothing, and in bags or containers of food.  In some cases, the defendant COs took breaks during their shifts and returned to their cars to retrieve contraband.  In other cases, the defendant COs avoided passing through the metal detector in the main lobby at CDF, enabling them to enter the facility and leave contraband in lockers or in the Officer's Dining Room, among other locations.

21.     Inside CDF, the defendant COs delivered contraband to detainees in their cells; in the hallways of detainee housing pods; in private offices where detainees and staff interacted; and at pre-arranged "stash" locations, such as janitorial carts or the laundry or property rooms within the jail.

22.     Inside CDF, detainees who were assigned jobs that enabled them to move throughout the jail, also known as "working men," took orders for contraband from fellow detainees, provided such orders to corrupt COs, and delivered contraband to other detainees on

behalf of corrupt COs. "Working men" also delivered handwritten notes, commonly referred to as "kites," from one detainee to another.

23.     The defendant detainees and facilitators paid the defendant COs for smuggled contraband using cash and electronic payment platforms, including but not limited to Cash App. The defendant detainees received payments from other detainees for contraband transactions via Cash App and other methods, often with the assistance of facilitators.

24.     The defendants used cell phones to communicate with one another and to coordinate their contraband smuggling and trafficking activities.  By using contraband cell phones, the defendant detainees avoided using CDF's jail call system, thereby enabling them to have undetected and unrecorded conversations with their associates.

### Overt Acts

25.     In furtherance of the conspiracy and to achieve the objectives thereof, the defendants and others performed and caused to be performed the following overt acts, among others, in the District of Maryland and elsewhere:

1)     In or about 2016, CO Andre DAVIS smuggled 50 strips of Suboxone to a detainee at CDF in exchange for a $1,000 bribe.

2)     In or about 2017, CO DAVIS smuggled a cell phone, a charger, and tobacco to a detainee at CDF in exchange for a bribe.

3)     In or about January 2017, CO DAVIS smuggled a package containing tobacco to a detainee at CDF in exchange for a bribe.

4)     In or about November 2017, CO Talaia YOUNGBLOOD smuggled a contraband smart watch to a detainee at CDF.

5)     In or about August 2018, CO DAVIS smuggled a contraband smart watch and a package containing tobacco to detainee Bernard BEY.

6)     On or about September 25, 2018, CO DAVIS solicited a $1,000 bribe from a detainee at CDF, in exchange for which he offered to smuggle a package containing tobacco into the jail.

7)     In or about October 2018, CO DAVIS solicited a bribe from a detainee at CDF, in exchange for which he offered to smuggle a contraband cell phone into the jail.

8)     In or about October 2018, CO DAVIS smuggled a package containing 100 strips of Suboxone to detainee Donte THOMAS.

9)     On or about October 5, 2018, detainee THOMAS received a handwritten note from another detainee at CDF.  The note read as follows: "if you need a bike [*i.e.*, a contraband cell phone] I can make it happen for u all I ask is keep what we do between me and you, if you accept. I will tell you where and how to get it."

10)    On or about October 10, 2018, detainee BEY and a second detainee possessed a contraband cell phone inside CDF.

11)    On or about October 16, 2018, facilitator Jasmine COLEMAN collected $75 via Cash App as payment for a sale of contraband by detainee THOMAS to detainee James HAIR. During a subsequent recorded jail call, COLEMAN notified THOMAS that the payment had been made.  While the call was in progress, THOMAS yelled to HAIR, "Hey Mook, you're 25 short!"

12)    On or about October 20, 2018, facilitator COLEMAN collected $25 via Cash App as payment for a sale of contraband by detainee THOMAS to detainee HAIR.  During a contemporaneous recorded jail call, COLEMAN notified THOMAS that the payment had been made.

13)      On or about October 31, 2018, detainee THOMAS placed a recorded jail call to a female associate.  During the call, the female associate told THOMAS that she had spoken with her aunt, and that her aunt wanted to know how THOMAS intended to have 100 strips of Suboxone smuggled into CDF.  THOMAS responded, "[the] stuff comes right to my door.  I have someone bring that shit to my front door."

14)      In or about November 2018, CO DAVIS solicited a $1,000 bribe from a detainee at CDF, in exchange for which he offered to smuggle a package containing tobacco into the jail.

15)      In or about November 2018, CO DAVIS smuggled a package containing 100 strips of Suboxone to detainees THOMAS and Andre WEBB in exchange for a bribe.

16)      On or about November 13, 2018, detainee THOMAS placed two recorded jail calls to facilitator COLEMAN.  During the first call, THOMAS told COLEMAN to meet with CO DAVIS and to provide DAVIS with contraband to be smuggled into CDF.  During the second call, THOMAS asked COLEMAN whether she knew what DAVIS looked like.  THOMAS explained that DAVIS had "corn rows" in his hair.  COLEMAN then asked for the first letter of DAVIS's name.  THOMAS responded, "D."  COLEMAN replied, "Alright.  The last letter 's,' I think?" THOMAS answered, "yeah."

17)      On or about November 17, 2018, detainee WEBB placed a recorded jail call to an outside facilitator.  During the call, WEBB asked the facilitator whether she would be able to meet with facilitator COLEMAN in advance of a planned meeting between COLEMAN and CO DAVIS.  The facilitator responded, "I'm going to meet her [*i.e.*, COLEMAN] and she's going to meet him [*i.e.*, CO DAVIS]."  WEBB explained to the facilitator, "It's not just me and you talking on the phone and you doing what I'm asking you to do, or you working by yourself.  You got to deal with two other people [*i.e.*, COLEMAN and CO DAVIS]."

18)     On or about November 17, 2018, detainee THOMAS placed a recorded jail call to facilitator COLEMAN.  During the call, COLEMAN told THOMAS that she had met with CO DAVIS and that she had provided DAVIS with a package containing contraband.  COLEMAN explained that DAVIS was demanding a $2,500 bribe in exchange for his assistance in smuggling the package into CDF.  THOMAS instructed COLEMAN to notify DAVIS via text message that THOMAS would pay DAVIS $2,500 "for the bike," *i.e.*, a contraband cell phone, on a future occasion.

19)     On or about November 28, 2018, CO DAVIS smuggled two strips of Suboxone to detainee THOMAS.

20)     On or about November 30, 2018, facilitator COLEMAN collected $20 via Cash App as payment for a sale of contraband by detainee THOMAS to detainee HAIR.

21)     On or about December 10, 2018, CO DAVIS smuggled two bags of tobacco to detainee THOMAS.

22)     On or about December 18, 2018, facilitator COLEMAN collected $1,100 via Cash App as payment for a sale of contraband by detainee THOMAS to another detainee at CDF.

23)     On or about December 18, 2018, facilitator COLEMAN collected $1,450 via Cash App as payment for a sale of contraband by detainee THOMAS to detainee BEY.

24)     On or about December 25, 2018, detainee THOMAS used a contraband cell phone to send text message to an associate.  THOMAS wrote: "They listening to all my calls and reading my mail that's why I got this shit [*i.e.*, the contraband cell phone]."

25)     On or about December 27, 2018, facilitator COLEMAN collected $200 via Cash App as payment for a sale of contraband by detainee THOMAS to another detainee at CDF.  Later

11

that day, COLEMAN sent a text message to THOMAS, who was using a contraband cell phone inside CDF, in which she notified THOMAS that the payment had been made.

26)     On or about December 29, 2018, facilitator COLEMAN collected $75 via Cash App as payment for a sale of contraband by detainee THOMAS to another detainee at CDF.  Later that day, COLEMAN sent a text message to THOMAS, who was using a contraband cell phone inside CDF, in which she notified THOMAS that the payment had been made.

27)     On or about December 30, 2018, detainee THOMAS used a contraband cell phone to exchange a series of messages with facilitator Lynette CARLEST.  THOMAS asked CARLEST to send him her Cash App user name so that THOMAS could pay CARLEST for having contraband cell phones smuggled into CDF.  THOMAS then conveyed a directive from detainee HAIR: "make sure the phones are activated with the plan already on them."  THOMAS told CARLEST that he had tried to send her payment via Cash App, but that Cash App was not working. THOMAS then wrote: "[T]his is [C]ruddy i'm in my cell i'm texting my wife [*i.e.*, COLEMAN] now she the one you getting the money from."

28)     On or about December 30, 2018, detainee THOMAS used a contraband cell phone to send a text message to an associate.  THOMAS instructed the associate to send $750 via Cash App to facilitator CARLEST.

29)     On or about December 30, 2018, facilitator COLEMAN collected $50 via Cash App as payment for a sale of contraband by detainee THOMAS to another detainee at CDF.  Later that day, COLEMAN sent a text message to THOMAS, who was using a contraband cell phone inside CDF, in which she notified THOMAS that the payment had been made.

30)     On or about December 31, 2018, facilitator COLEMAN collected $25 via Cash App as payment for a sale of contraband by detainee THOMAS to another detainee at CDF.  Later that

12

day, COLEMAN sent a text message to THOMAS, who was using a contraband cell phone inside CDF, in which she notified THOMAS that the payment had been made.

31)        On or about January 1, 2019, facilitator COLEMAN collected $48.62 via Cash App as payment for a sale of contraband by detainee THOMAS to another detainee at CDF.  Later that day, COLEMAN sent a text message to THOMAS, who was using a contraband cell phone inside CDF, in which she notified THOMAS that the payment had been made.

32)        On or about January 2, 2019, detainee WEBB used a contraband cell phone to exchange a series of text messages with an outside facilitator.  The facilitator notified WEBB that she had recently purchased fifty-five 12 milligram Suboxone strips for $440.  WEBB responded that he intended to sell the Suboxone strips to detainees inside CDF at a price of $75 per strip, for a total expected revenue of $4,125.  WEBB told the facilitator, "that's a handsome ransom right[?]" The facilitator responded, "Mfs come home richer in there lol."

33)        On or about January 2, 2019, facilitator COLEMAN collected $300 via Cash App as payment for a sale of contraband by detainee THOMAS to another detainee at CDF.  Later that day, COLEMAN sent a text message to THOMAS, who was using a contraband cell phone inside CDF, in which she notified THOMAS that the payment had been made.

34)        On or about January 4, 2019, detainee THOMAS used a contraband cell phone to send a text message to an associate.  THOMAS wrote: "I can't just be on the [contraband cell] phone all the time u for got [sic] this shit ain't legal."

35)        On or about January 6, 2019, detainee THOMAS used a contraband cell phone to exchange a series of text messages with an associate.  THOMAS wrote: "I'm sitting here smoking my weed watching tv."  The associate responded, "Whatttttt[?]"  THOMAS answered: "Yeah it pass my day bye [sic] fast."

13

36)     On or about January 8, 2019, detainee THOMAS used a contraband cell phone to exchange a series of text messages with an outside facilitator about smuggling a cell phone charger into CDF.  THOMAS told the facilitator: "I need you to bye [sic] this charger for my phone[.]  I broke my shit[.]"  THOMAS asked the facilitator to send $60 "to the person cash app thTs [sic] supposed to bring it in."  THOMAS then added: "or take them the money[.]"

37)     On or about January 11, 2019, detainees THOMAS and WEBB possessed a contraband cell phone inside CDF.  CO DAVIS had previously smuggled the cell phone into CDF on THOMAS's and WEBB's behalf.   WEBB also possessed with intent to distribute approximately 59 strips of buprenorphine, also known as Suboxone, a Schedule III controlled substance.

38)     On or about January 19, 2019, detainee HAIR and a second detainee possessed a contraband cell phone inside CDF.

39)     On or about January 22, 2019, facilitator CARLEST wired a $1,000 bribe to CO PARKER using Cash App.

40)     On or about January 27, 2019, facilitator CARLEST wired a $1,080 bribe to CO PARKER via Cash App.

41)     On or about January 29, 2019, detainee HAIR sent a handwritten note to another detainee at CDF.  In the note, HAIR referenced a prior occasion when  he had sold the detainee a contraband cell phone.  HAIR complained that the detainee had been talking recklessly on the cell phone and incriminating HAIR: "my man say you was on some hot shit as soon as you got it you on the phone [*i.e.*, the contraband cell phone] and saying my name."  HAIR explained that as a result of the detainee's indiscretions, HAIR's cell had been "shook down" (*i.e.*, searched) by CDF correctional officers.  HAIR explained that during the search, correctional officers had confiscated

14

his contraband cell phone, and that he had flushed 28 strips of Suboxone down the toilet to prevent them from being discovered.

42)     In or about February 2019, CO DAVIS solicited a bribe from a detainee at CDF, in exchange for which he offered to smuggle tobacco into the jail.

43)     On or about February 2, 2019, detainee HAIR agreed to sell a cell phone to another detainee at CDF. While negotiating the sale, HAIR told the detainee that CO PARKER would smuggle the cell phone into the jail. HAIR explained that PARKER had previously smuggled seven cell phones into CDF on HAIR's behalf. HAIR instructed the detainee to have his outside facilitator provide the cell phone to facilitator CARLEST, and to pay CARLEST to have the cell phone smuggled into CDF, by "Thursday," *i.e.*, February 7, 2019.

44)     On or about February 7, 2019, an undercover law enforcement officer placed a telephone call to detainee HAIR, who was using a contraband cell phone inside CDF. During the call, the officer posed as an outside facilitator associated with the detainee who had agreed to purchase a contraband cell phone from HAIR. HAIR instructed the officer to meet with facilitator CARLEST that afternoon, so that the officer (whom HAIR believed was an outside facilitator) could provide CARLEST with the cell phone, as well as payment for having the cell phone smuggled into CDF.

45)     On or about February 7, 2019, in the 800 block of Guilford Avenue in Baltimore, Maryland, facilitator CARLEST met with the undercover law enforcement officer who was posing as an outside facilitator associated with the detainee who had agreed to purchase a contraband cell phone from detainee HAIR. During the meeting, the officer provided CARLEST with the cell phone and a charger, as well as a $1,500 payment for having the cell phone and charger smuggled

15

into CDF.  At the conclusion of the meeting, CARLEST told the officer that she was on her way to deliver the cell phone and charger to CO PARKER.

46)      On or about February 7, 2019, facilitator CARLEST met with CO PARKER near the intersection of North Front and Low Streets in Baltimore, Maryland.  During the meeting, CARLEST provided CO PARKER with the cell phone and charger she had received from the undercover law enforcement officer earlier that day.

47)      On or about February 8, 2019, facilitator CARLEST wired an $800 bribe via Cash App to CO PARKER.

48)      On or about February 11, 2019, CO PARKER smuggled a contraband cell phone and charger, as well as Suboxone and tobacco, into CDF.  PARKER provided the cell phone, charger, Suboxone, and tobacco to detainee HAIR.  HAIR, in turn, provided the cell phone and charger to a detainee who had previously arranged to purchase them for $1,500.

49)      On or about February 16, 2019, facilitator CARLEST wired a $900 bribe via Cash App to CO PARKER.

50)      On or about February 18, 2019, CO PARKER smuggled liquor into CDF, which he hid inside a water bottle and delivered to detainee HAIR as a birthday present.

51)      On or about February 28, 2019, facilitator CARLEST exchanged a series of text messages with CO PARKER, in which she notified PARKER that she had "money for the thing"— *i.e.*, a bribe to be paid to PARKER in exchange for his assistance in smuggling contraband to detainee HAIR at CDF.  PARKER responded, "ok."

52)      On or about February 28, 2019, facilitator CARLEST collected $100 via Cash App as payment for a sale of contraband by detainee HAIR to another detainee at CDF.

16

53) On or about February 28, 2019, facilitator CARLEST collected $1,000 via Cash App as payment for a sale of contraband by detainee HAIR to another detainee at CDF.

54) On or about March 1, 2019, facilitator CARLEST received a text message from an outside facilitator who had sent CARLEST money via Cash App as payment for a sale of contraband by detainee HAIR to another detainee at CDF. The facilitator asked CARLEST, "What happening he [*i.e.*, the detainee-customer] needs to find out." Later that day, CARLEST placed a telephone call to HAIR, who was using a contraband cell phone inside CDF. CARLEST told HAIR that she had just received a text message from the detainee's facilitator. HAIR asked CARLEST whether she had purchased the cell phone that the detainee had paid HAIR (through CARLEST) to smuggle into CDF. CARLEST responded, "Yeah. I went and picked up the phone today." HAIR asked CARLEST whether she had made arrangements to deliver the cell phone to CO PARKER, so that PARKER could smuggle the cell phone into CDF. CARLEST responded, "I told you last night he [*i.e.*, PARKER] said OK."

55) On or about March 2, 2019, facilitator CARLEST collected $275 via Cash App, in two separate installments, as payment for a sale of contraband by detainee HAIR to another detainee at CDF. The following day, CARLEST received a telephone call from detainee HAIR, who was using a contraband cell phone inside CDF. During the call, CARLEST told HAIR that she had collected $275 from the facilitator. She further told HAIR that the detainee associated with the facilitator had ordered "four strips and three browns," *i.e.*, four strips of Suboxone and three units of tobacco. CARLEST explained that HAIR had accumulated $6,000 in profit from the sale of contraband inside CDF, as well as an additional amount of money that CARLEST maintained at her apartment and used to bribe CO PARKER for smuggling contraband into CDF on HAIR's behalf.

17

56)     On or about March 3, 2019, detainee HAIR placed a telephone call to facilitator CARLEST using a contraband cell phone.  During the call, HAIR asked CARLEST whether she had received "that other $100 for that phone"—*i.e.*, a partial payment for a contraband cell phone that HAIR had arranged to sell to another detainee.

57)     On or about March 3, 2019, facilitator CARLEST collected $75 via Cash App as payment for a sale of contraband by detainee HAIR to another detainee at CDF.

58)     On or about March 6, 2019, facilitator CARLEST collected $50 via Cash App as payment for a sale of contraband by detainee HAIR to another detainee at CDF.  Later that day, CARLEST placed a telephone call to HAIR, who was using a contraband cell phone inside CDF.  During the call, CARLEST notified HAIR that she had received $50 on behalf of a detainee who wanted "some smoke."

59)     On or about March 7, 2019, facilitator CARLEST collected $100 via Cash App as payment for a sale of contraband by detainee HAIR to another detainee at CDF.  Later that day, CARLEST received a telephone call from HAIR, who was using a contraband cell phone inside CDF.  During the call, CARLEST informed HAIR that she had collected $100 from an outside facilitator.  HAIR asked CARLEST whether she had received payments from facilitators associated with two additional detainees.  CARLEST responded that she had not.  Within hours of her telephone call with HAIR, CARLEST collected $400—in separate installments of $200, $100, and $100—from facilitators associated with those detainees.

60)     On or about March 8, 2019, facilitator CARLEST received a telephone call from an outside facilitator associated with a detainee who had agreed to purchase a contraband cell phone from detainee HAIR for $1,600.  During the call, the facilitator told CARLEST that the detainee wanted his money back if the cell phone could not be delivered.  CARLEST responded that she

18

had already given the cell phone to CO PARKER, and that PARKER was "on vacation" and would return to work on "Sunday [March 10, 2019] or Monday [March 11, 2019]." Later that evening, CARLEST received a telephone call from HAIR, who was using a contraband cell phone inside CDF. During the call, CARLEST notified HAIR that she had told the detainee's facilitator to wait for PARKER "to come back and bring the stuff."

61)     On or about March 8, 2019, facilitator CARLEST received a telephone call from detainee HAIR, who was using a contraband cell phone inside CDF. During the call, HAIR asked CARLEST when she planned to meet with CO PARKER. CARLEST replied that she planned to meet with CO PARKER "on Sunday [March 10, 2019]." HAIR instructed CARLEST to notify PARKER that a detainee had paid $1,600 to have a contraband cell phone smuggled into CDF.

62)     On or about March 8, 2019, facilitator CARLEST received a telephone call from detainee HAIR, who was using a contraband cell phone inside CDF. While the call was in progress, CARLEST collected $50 via Cash App as payment for a sale of contraband by HAIR to another detainee at CDF. CARLEST notified HAIR that the payment had been made.

63)     On or about March 9, 2019, facilitator CARLEST collected $50 via Cash App as payment for a sale of contraband by detainee HAIR to another detainee at CDF. Later that day, CARLEST received a telephone call from HAIR, who was using a contraband cell phone inside CDF. During the call, CARLEST notified HAIR that the payment had been made.

64)     On or about March 10, 2019, facilitator CARLEST exchanged a series of text messages with CO PARKER, in which CARLEST and PARKER made arrangements to meet. Later that day, CARLEST received a telephone call from detainee HAIR, who was using a contraband cell phone inside CDF. During the call, HAIR instructed CARLEST to tell PARKER

19

that two detainees "want[ed] phones real bad," and that the detainees were each willing to pay $1,500 to have the cell phones smuggled into CDF.

65)  On or about March 10, 2019, facilitator CARLEST met with CO PARKER near the intersection of North Front and Low Streets in Baltimore, Maryland. During the meeting, CARLEST provided PARKER with a black plastic bag. The bag contained, among other items, Suboxone, tobacco, and a cell phone and charger.

66)  On or about March 10, 2019, facilitator CARLEST received a telephone call from detainee HAIR, who was using a contraband cell phone inside CDF. During the call, CARLEST notified HAIR that she planned to tell CO PARKER that she would send him a bribe payment the following day. HAIR instructed CARLEST to tell PARKER, "thanks for everything—we really appreciate you." CARLEST then sent multiple text messages to PARKER. In the first message, CARLEST wrote, "I'm gonna cash app you in [sic] tomorrow." In the second, CARLEST told PARKER, "Thanks for everything we really appreciate you."

67)  On or about March 10, 2019, facilitator CARLEST exchanged a series of messages with CO PARKER, in which she notified PARKER that CDF administrators had moved detainee HAIR to a different cell at CDF because HAIR had failed a urine drug test. PARKER responded that HAIR should tell CDF administrators that he had failed the urine drug test because he was taking prescription drugs for a medical condition.

68)  On or about March 10, 2019, facilitator CARLEST exchanged a series of text messages with CO PARKER, in which CARLEST asked PARKER to guarantee that detainee HAIR would receive a contraband cell phone the following day. CARLEST explained, "whom ever [sic] the phone is for sent him [*i.e.*, HAIR] a not so friendly message." PARKER responded, "It will be in there tomorrow."

20

69)     On or about March 10, 2019, facilitator CARLEST collected $50 via Cash App as payment for a sale of contraband by detainee HAIR to another detainee at CDF.

70)     On or about March 11, 2019, in the parking lot outside CDF, CO PARKER possessed with intent to distribute a quantity of a mixture or substance containing a detectable amount of buprenorphine, also known as Suboxone, a schedule III controlled substance. PARKER also possessed approximately 112 grams of tobacco and a cell phone and charger. PARKER intended to smuggle the Suboxone, tobacco, cell phone and charger, as well as other items, to detainee HAIR in exchange for a bribe.

71)     On or about March 11, 2019, facilitator CARLEST received a telephone call from detainee HAIR, who was using a contraband cell phone inside CDF. During the call, HAIR notified CARLEST that CO PARKER had been caught by investigators attempting to smuggle contraband into CDF. CARLEST responded, "OMG."

72)     On or about March 11, 2019, facilitator CARLEST placed a telephone call to her daughter. During the call, CARLEST told her daughter, "I need to go find me a new phone." She than explained that "the guy that been taking James [*i.e.*, detainee HAIR] stuff in the jail [*i.e.*, CO PARKER] got locked up today."

73)     On or about March 11, 2019, detainee HAIR wrote a note to another detainee at CDF. HAIR informed the detainee that CO PARKER had been caught by investigators attempting to smuggle contraband into CDF. HAIR wrote: "they locked yo [*i.e.*, PARKER] up this am and my girl [*i.e.*, CARLEST] and I have to meant [sic] to shit they shook me and shit ugly."

74)     On or about March 14, 2019, detainee BEY possessed a contraband cell phone inside CDF.

21

75)     On or about April 2, 2019, detainee BEY sent a handwritten note to another detainee at CDF.  In the note, BEY offered to provide the detainee, as well as a second unidentified accomplice, with $1,000 worth of K2 in exchange for assaulting a detainee who had previously accused BEY of cooperating with law enforcement.  BEY enclosed a quantity of K2 with the note, and he instructed the detainee that he wanted the assault committed "immediately."

76)     On or about April 11, 2019, CO DAVIS solicited a $1,000 bribe from a detainee at CDF, in exchange for which DAVIS offered to smuggle a package of tobacco into the jail.

77)     On or about April 15, 2019, detainee BEY and his cell mate possessed a quantity of a mixture or substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance.  BEY also possessed a handwritten note from detainee HAIR, in which HAIR explained that he had paid another individual to smuggle Suboxone into CDF.

78)     On or about May 7, 2019, detainee BEY received a handwritten note from another detainee at CDF.  The detainee wrote that he wanted to send BEY money for contraband that BEY had provided him on a prior occasion.  The detainee also wrote, "please send more, cuz I can move it" (*i.e.*, distribute the contraband within the jail).

79)     On or about May 8, 2019, detainee BEY distributed K2 to another detainee at CDF.

80)     On or about May 8, 2019, detainee BEY sent eight pieces of K2, as well as two handwritten notes, to another detainee at CDF.  In the first note, BEY provided the detainee with a menu of prices for K2 that BEY was offering for sale.  BEY wrote: "$30 a piece/8 pieces = 240[.] $25 a piece/8 pieces = $200.  [G]et a ruler use the inch—each piece .14[.]  its [sic] 8 pieces here."  In the second note, BEY provided the name and telephone number for an outside facilitator, and he instructed the detainee to "tell your peoples to call him for Cash App the $100."

81)     On or about May 16, 2019, detainee BEY sent eight pieces of K2, as well as a handwritten note, to another detainee at CDF. BEY wrote: "here's a few pieces ($25 each) from me & your father. $200 total so you can get food etc. when you come off lockup."

82)     On or about May 16, 2019, detainee BEY sent a handwritten note to another detainee at CDF, in which BEY provided the other detainee with the name and Cash App account information for one of his outside facilitators.

83)     In or about March 2020, detainee BEY sent a handwritten note to CO YOUNGBLOOD, in which he notified YOUNGBLOOD that an outside facilitator (whom BEY called "Brother") would soon be providing YOUNGBLOOD with a quantity of marijuana, as well as CDs and DVDs, to smuggle into CDF. BEY further instructed YOUNGBLOOD to remind "Brother" to provide her with a cell phone. BEY wrote: "Tell Brother give you the iphone too[.] [J]ust tell him I need you to have that one." BEY also told YOUNGBLOOD to contact a second outside facilitator (whom BEY called "Fatman"), so that "Fatman" could provide YOUNGBLOOD with a pair of designer eyeglasses as a bribe payment. "Hit Fatman," BEY wrote. "[T]ell him you been looking out for me real good over here[.] Tell him I said I need him to get you a nice pair of glasses preferably 'Alexander McQueen[.]' Tell him you're trying to sport what I sport."

84)     On or about March 25, 2020, CO YOUNGBLOOD agreed to purchase half an ounce of marijuana from a third party supplier for $125.

85)     On or about March 28, 2020, detainee BEY provided CO YOUNGBLOOD with an Apple iPhone 6s through an outside facilitator.

86)     On or about April 1 and 2, 2020, CO YOUNGBLOOD exchanged a series of text messages with detainee BEY using the Apple iPhone that she had previously received from BEY's

23

outside facilitator. BEY, in turn, was using a contraband cell phone inside CDF. In her initial text message, YOUNGBLOOD told BEY that she had called BEY's outside facilitator, "Fatman," about the designer eyeglasses that "Fatman" was supposed to provide her as a bribe on BEY's behalf. YOUNGBLOOD then explained that she and "Fatman" had arranged to meet the following weekend. The next day (*i.e.*, April 2, 2020), YOUNGBLOOD sent a text message containing a link to a web site that had listed a pair of designer eyeglasses for sale. BEY responded that he could not see the listing because he could not access the Internet on his contraband cell phone. YOUNGBLOOD replied that BEY would see the glasses soon, if "Fatman" provided them to YOUNGBLOOD, as expected. "He will," BEY wrote. "U r now f___ wit the best!"

87)      On or about April 2, 2020, detainee BEY used a contraband cell phone to exchange a series of text messages with CO YOUNGBLOOD regarding a sexual encounter. BEY wrote: "U brighting me up [sic] … thanks for that lay." YOUNGBLOOD responded, "Np babes … Your [sic] so welcome. YOUNGBLOOD sent an additional response the following day: "U the best! Im glad we embrace/catch u tomorrow."

88)      On or about April 3, 2020, CO YOUNGBLOOD possessed with intent to distribute a quantity of a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance. YOUNGBLOOD also possessed a grinder; a digital scale; $3,581 in U.S. currency; photographs of detainees at CDF, including detainee BEY; and three handwritten birthday cards from detainees at CDF.

89)      On or about April 12, 2020, detainee BEY used a contraband cell phone to place a telephone call to an associate. During the call, BEY referenced a prior occasion when he and another detainee possessed a different contraband cell phone inside CDF. BEY explained that after he and the other detainee acquired the contraband cell phone, the other detainee stopped

24

coming out of his cell and "used to live on th[e] daggone phone." BEY recalled, "we had something so sweet in here boy! Man, we eating all delicious food." After a pause, BEY then told his associate that there was a female correctional officer in his housing area, and that the officer knew he possessed a contraband cell phone. "It's a chick working," BEY told his associate. "She know I got it."

90)     On or about April 15, 2020, detainee BEY used a contraband cell phone to place a telephone call to one of his outside facilitators. During the call, BEY directed the facilitator to send $500 via Cash App to an account belonging to a CDF correctional officer.

91)     On or about April 17, 2020, detainee BEY used a contraband cell phone to place a telephone call to one of his outside facilitators. During the call, BEY explained that CO YOUNGBLOOD had been "staying away" and that "something [had] spooked her." Unbeknownst to BEY, YOUNGBLOOD had been suspended following the recovery of narcotics and other contraband, as well as a handwritten note from BEY and a cell phone that BEY had provided her, during the execution of a search warrant at her residence on April 3, 2020. BEY told his facilitator that YOUNGBLOOD "was already on board," *i.e.*, willing to smuggle contraband into CDF, because of "all that you offered her," *i.e.*, bribes. BEY acknowledged that under the circumstances, his arrangement with YOUNGBLOOD was "dead, homie."

92)     On or about April 20, 2020, detainee BEY used a contraband cell phone to place a telephone call to an associate. During the call, BEY explained that he had paid a $500 bribe to a correctional officer. BEY stated as follows: "I wanted to send the whore 200, but that's not gonna do nothing for her. So I said alright, let me show her I'm just getting you money just cause you know I feel you substantial. So I sent her a nickel," *i.e.*, $500.

93)     On or about April 20, 2020, detainee BEY use a contraband cell phone to place a telephone call to an associate. During the call, BEY explained that he was drinking vodka that he had bribed a correctional officer to smuggle into CDF. "I got some Ciroc," BEY said. "I'm going to drink a little bit of that." The associate responded, "How do you get shit like that?" BEY replied, "The chicks bring it in for me … pay 'em decent, they do you decent."

94)     On or about June 5, 2020, CO DAVIS possessed multiple handwritten notes from a CDF detainee in his bedroom closet. The notes were contained in an envelope, which was addressed to a second detainee who lived on D Pod at CDF. In the notes, the author asked the recipient to "press up on," or pressure, a third detainee who owed the author $2,100. The author explained that he could not collect the debt himself because he had been placed on "lockup" for an unspecified rule violation. The author stated that he was enclosing quantities of K2 and Suboxone, and he promised to send additional quantities of K2 if the recipient successfully collected the debt.

18 U.S.C. §1962(d)

## FORFEITURE

### Rico Forfeiture

1.      Pursuant to Title 18, United States Code, Section 1963, upon conviction of an

offense in violation of Title 18, United States Code, Section 1962, the defendants

**DARREN PARKER,**
**ANDRE DAVIS, a/k/a "2 Chainz,"**
**TALAIA YOUNGBLOOD,**
**JAMES HAIR, a/k/a "Mook,"**
**DONTE THOMAS, a/k/a "Cruddy,"**
**ANDRE WEBB, a/k/a "Arnie,"**
**BERNARD BEY, a/k/a "Tony Bey,"**
**LYNETTE CARLEST, and**
**JASMINE COLEMAN,**

shall forfeit to the United States of America:

a.      any interest acquired or maintained in violation of section 1962;

b.      any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendants established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and

c.      any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of 1962.

2.      The interests of the defendant subject to forfeiture to the United States pursuant to

18 U.S.C. § 1963(a)(1), (a)(2), and (a)(3), include, but are not limited to a sum of money

representing the amount of the gross proceeds received by the defendants derived from

racketeering activity as alleged in this Indictment.

18 U.S.C. § 1963
28 U.S.C. § 2461(c)
18 U.S.C. § 924(d)

27

_Robert K. Hur/pjm/cah_

ROBERT K. HUR
UNITED STATES ATTORNEY

A TRUE BILL:

10-14-2020

Date

## SIGNATURE REDACTED

Foreperson

28